AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Louisiana

| | |
|---|---|
| United States of America<br>v.<br>ROBERTO DIP and<br>JASON HANDAL<br><br>*Defendant(s)* | )<br>)<br>)  Case No.<br>)     18-84-MAG<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __beginning in at least March 2014__ in the county of __Jefferson Parish__ in the __Eastern__ District of __Louisiana & elsewhere__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 15, United States Code, Section 1. | An unlawful combination and conspiracy to unreasonably restrain interstate trade and commerce through an agreement to raise and fix prices in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). |

This criminal complaint is based on these facts:

Defendants participated in a conspiracy to suppress and eliminate competition by fixing prices charged to customers in the U.S. for freight forwarding services provided in the U.S. and elsewhere, in unreasonable restraint of interstate trade and commerce, as more fully described in the attached Affidavit in Support of Criminal Complaint and Arrest Warrant.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Eric Hathaway, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 25, 2018

_____
*Judge's signature*

City and state: New Orleans, LA     Hon. Joseph C. Wilkinson, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# CRIMINAL COMPLAINT AND ARREST WARRANT
# FILED UNDER SEAL

I, Special Agent Eric Hathaway, being first duly sworn, hereby state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since September 1997. I am assigned to a Public Corruption squad at the New Orleans office of the FBI. I am currently assigned to investigate public corruption, antitrust and white collar crime matters involving violations of Title 18, United States Code (U.S.C.) Sections 666, 1341, and 1343; Title 15, U.S.C. Section 1; as well as other U.S.C. Sections. As a Special Agent, I have received training and have gained experience in the investigation of criminal violations enforced by the FBI enumerated in Titles 15, 18, and 21 of the United States Code. Specifically, I received sixteen weeks of training at the FBI Academy in Quantico, Virginia.

2. I am familiar with the circumstances of the offense described in this affidavit through a combination of personal knowledge of the facts; discussions with other law enforcement officials; and other investigative activities conducted and investigative materials obtained during the investigation. The documents described in this affidavit were translated from Spanish into English by FBI and DOJ employees who are fluent in both languages.

3. I make this affidavit in support of an application for issuance of a criminal complaint and arrest warrant for ROBERTO DIP ("DIP") and JASON HANDAL ("HANDAL"), for violation of Title 15, United States Code, Section 1, conspiracy in restraint of trade. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. The facts and circumstances set forth in this affidavit demonstrate that there is probable cause to believe that DIP and HANDAL engaged in a conspiracy with their competitors

to suppress and eliminate competition by fixing the prices for international freight forwarding services in the United States, in violation of 15 U.S.C. § 1 (Sherman Antitrust Act).

## APPLICABLE LAW

5. Section 1 of the Sherman Act, 15 U.S.C. § 1, makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . . Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court." Thus, the Sherman Act prohibits every conspiracy, agreement, understanding, plan, or scheme, between competitors, in or affecting interstate or foreign commerce, to: (a) fix, set, raise, lower, maintain, stabilize, or otherwise affect prices; (b) rig bids; or (c) allocate customers or markets. All such agreements are illegal, even if never carried out or if unsuccessful. The agreement itself is the crime.

## BACKGROUND OF INVESTIGATION AND STATEMENT OF PROBABLE CAUSE

6. The FBI's New Orleans office, in conjunction with the Antitrust Division of the Department of Justice, is investigating collusive agreements among freight forwarding companies and their employees that handle the ocean shipment of containerized goods from the United States to Honduras and other locations, in violation of 15 U.S.C. § 1.

7. Freight forwarders arrange for and manage the shipment of goods from one point to another. Freight forwarders provide freight forwarding services by receiving, packaging, and otherwise preparing cargo destined for ocean shipment to or from the United States; by arranging

transportation in conjunction with an ocean freight shipment to or from the United States; and by preparing documents to accompany an ocean freight shipment to or from the United States. The cargo is shipped in steel containers called intermodal containers. These containers are generally 20 to 40 feet long and are designed to be transported via container cargo ships, trucks, and trains.

8. DIP is the owner and CEO of Company A, a company that provides freight forwarding services in the United States and elsewhere to customers seeking to ship cargo from the United States to Honduras and elsewhere. HANDAL is a manager at Company A. Company A operates in multiple ports throughout the United States, including, among others, New Orleans, Louisiana.

9. Emails and other publicly available information confirm that on March 20, 2014, DIP attended a meeting in San Pedro Sula, Honduras, with numerous competitor freight forwarding companies that arrange shipments of cargo to be transported from the United States to Honduras and other destinations. After the meeting, DIP emailed HANDAL and confirmed that DIP and various competitors reached an agreement to raise prices charged to U.S.-based customers on cargo to be shipped from the United States. DIP and others in attendance at the meeting agreed to establish "commissions," to be comprised of 5-6 companies each, in various cities throughout the United States. The commissions were charged with implementing the price-fixing agreement.

10. Following the meeting, DIP, HANDAL, and their co-conspirators communicated by email to confirm their commitment to raise prices.

11. On March 30, 2014, DIP emailed a summary of the March 20 meeting to representatives of numerous competitor freight forwarding companies. He assigned specific groups of competitor companies to meet with others in their regional areas for the purpose of

3

implementing the agreement to raise prices, and encouraged ending "unjustified price wars." DIP assigned himself to be the "coordinator" for prices for the New Orleans commission and also enlisted HANDAL to assist this effort. DIP also assigned HANDAL to the collusive "commission" in another port.

12. Subsequently, DIP, HANDAL, and numerous competitor freight forwarders convened meetings and engaged in collusive communications to implement and reaffirm the agreement to raise prices. Evidence obtained in the course of the investigation, including emails and audio recordings, confirm that DIP, HANDAL, and their co-conspirators knowingly joined and participated in an agreement to fix prices. For example:

   a. On April 3, 2014, HANDAL attended a collusive "commission" meeting with representatives from numerous competitor freight forwarding companies. At that meeting, HANDAL and Company A's competitors agreed to increase prices for shipments originating from that port. An email summarizing the meeting stated that the competitors, including HANDAL, had "a gentleman's agreement between people who keep their word." A list of specific prices discussed during the meeting was later circulated within Company A.

   b. DIP corresponded by email with additional freight forwarding companies in an effort to convince them to also increase prices consistent with the agreement. Between April 5 and April 9, 2014, DIP exchanged a series of emails with one such company, in which he noted that one of the collusive "commissions" had already reached an agreement to increase prices by a specified amount.

   c. On April 13, 2014, DIP exchanged emails with HANDAL and other Company A employees about implementing the price fixing agreement in New Orleans. In

one email, DIP wrote that the "FMC [Federal Maritime Commission] cannot have a hand in something like this because it is illegal for businesses to set the price for price fixing." DIP also confirmed that the competitor companies in New Orleans "are all in agreement to raise prices except for [one company] . . . ."

d. On April 23, 2014, a Company A employee reported to DIP and HANDAL that Company A's competitors "hold firmly that all apply the same rates," and that many had already started charging the agreed to "new prices" in one of the ports.

e. On May 13, 2014, HANDAL organized and attended a meeting of the New Orleans collusive "commission." At that meeting, as reflected in witness statements, admissions, and other evidence obtained in this investigation, HANDAL confirmed that Company A had reached agreements with freight forwarding companies in other ports. At that meeting, HANDAL and other New Orleans-based freight forwarders, confirmed that they were "willing to agree on a price and to honor it." The next day, HANDAL emailed DIP and other Company A employees to begin charging the new prices, noting that "they are already selling these rates at least in [New Orleans] . . . ." The new Company A prices matched the prices that HANDAL discussed with his competitors at the May 13, 2014 meeting.

13. DIP and HANDAL acknowledged that their conduct was illegal and violated U.S. antitrust laws, and took steps to conceal their conduct. For example, prior to a meeting of one of the collusive "commissions"—whose members included HANDAL—DIP emailed Company A's employees, including HANDAL, to caution them against leaving evidence, "as there are Anti-

Trust laws that penalize businesses that collude to fix prices of a product or service (price fixing) with prison time and fines. We must explain this to them … so nothing appears in writing."

14. Evidence shows that the agreement remained in place until at least March 2015, when HANDAL emailed DIP and others and confirmed Company A's continued adherence to certain prices that were "established approximately 1 year ago" to keep "the same level of competition."

15. Based on my training and experience and the evidence obtained in this investigation, there is probable cause to believe that DIP and HANDAL reached an agreement with their competitors to fix and increase the prices for international freight forwarding services in the United States, in violation of 15 U.S.C. § 1.

Respectfully submitted,

_____
Eric Hathaway
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me on ___June 25, 2018___

_____
UNITED STATES MAGISTRATE JUDGE